David I. LINTZ, M.D., et al., Plaintiffs,

v.

CAREY MANOR LIMITED, et al., Defendants,

and

Dr. John FARRELL, et al., Plaintiffs,

v.

CAREY MANOR LIMITED, et al., Defendants.

Morris SHAFMAN, et al., Plaintiffs,

v.

MARK PARTNERS 1980–A, et al., Defendants,

and

Vicki JAY, et al., Plaintiffs,

v.

MARK PARTNERS 1980–A, et al., Defendants.

Myron BRIN, et al., Plaintiffs,

v.

TIMBERIDGE ASSOCIATES LIMITED, et al., Defendants,

and

Mr. and Mrs. Guy DEMASCOLO, et al., Plaintiffs,

v.

TIMBERIDGE ASSOCIATES LIMITED, et al., Defendants.

Anthony J. MONTICELLO, Plaintiff,

v.

GULF PARTNERS LIMITED, et al., Defendants,

and

Klaus LAMPMANN, et al., Plaintiffs,

v.

GULF PARTNERS LIMITED, et al., Defendants.

Civ. A. Nos. 83–0079–R, 83–0993–R; 83–0080–R, 83–0991–R; 83–0081–R, 83–0980–R; 83–0082–R, 83–0996–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

May 13, 1985.

Douglas W. Davis, Jack E. McClard, Gregory G. Little and Ann T. Burks, Hunton & Williams, Richmond, Va., for plaintiffs.

Daniel S. Brown, Brian R. Jones, Woods, Rogers & Hazelgrove, Roanoke, Va., for Gregory Harrell and Graham Larmer.

William R. Rakes, Karen W. McCutcheon, W. David Paxton, Gentry, Locke, Rakes & Moore, Roanoke, Va., for W.F. Mason, Jr.

## AMENDED MEMORANDUM OPINION

KISER, District Judge.

Defendants Harrell and Larmer, individually and as partners in the firm of Faine, Harrell, Larmer & Co. (the "Accountants") and Defendant Mason have moved for partial summary judgment on those allegations in the amended complaints premised on the local securities laws (Blue Sky laws) of Virginia, New Jersey and Florida. The Defendants set forth numerous grounds in support of their motion, but their primary claim is that under traditional conflicts of law principles, the Blue Sky laws of New Jersey or Florida should apply to this case instead of the Virginia Securities Act. The Defendants go on to analyze the New Jersey and Florida Acts, and argue why summary judgment is appropriate under those statutes. Because of this Court's resolution of the conflicts issue, it will not be necessary to examine Defendants' claims under the New Jersey and Florida laws.

### I. *Factual Background*

The Mark Companies of America, Inc. ("Mark Companies") is an investment development company specializing in the development of real estate properties utilizing HUD insured mortgages. Mark Companies, through its numerous affiliates, offered and sold limited partnership interests in apartment projects that were to be financed by HUD insured mortgages. Units in each partnership were offered to potential investors via a lengthy private placement memorandum ("PPM"). The consideration paid for each partnership unit in each limited partnership consisted of a cash payment and the signing of a series of four annual interest-bearing notes. The Plaintiffs in these four consolidated cases invested as limited partners in the following partnerships.

Mark Partners 1980–A ("Mark Partners") is a Virginia limited partnership formed to acquire and hold limited partnership interests in two local limited partnerships: (1) Bridlewood, Ltd., a South Carolina limited partnership, formed to develop, own, and operate the Bridlewood apart-

ment complex, which was to be built in Mount Pleasant, South Carolina; and (2) Cinnamon Ridge, Ltd., a North Carolina limited partnership formed to develop, own and operate the Cinnamon Ridge apartment complex, which was to be built in Asheville, North Carolina. Mark Partners closed on December 12, 1980. By letter dated December 29, 1981, the investors in Mark Partners were notified that Mark Partners had recently acquired interests in Mark Real Estate Fund Limited III ("Fund III") and IV ("Fund IV") and Cordoba Management Limited III ("Cordoba III") and IV ("Cordoba IV").

Gulf Partners, Ltd. ("Gulf"), is a Mississippi limited partnership formed to develop, own and operate the Whispering Oaks apartment complex, which was to be built in Biloxi, Mississippi. Gulf closed on December 22, 1980. By letter dated December 22, and 29, 1981, investors in Gulf were notified that Gulf had purchased limited partnership interests in Mark Real Estate Fund V ("Fund V") and Cordoba Management Limited V ("Cordoba V").

Timberidge Associates, Ltd. ("Timberidge") is a West Virginia limited partnership formed to develop, own and operate the Timberidge II apartment complex, which was to be built in Beckley, West Virginia. Timberidge closed on November 30, 1981. By letter dated January 18, 1982, investors in Timberidge were notified that Timberidge had purchased 26 units of interest in each of two other partnerships, Mark Real Estate Fund Limited VIII ("Fund VIII") and Cordoba Management Limited VIII ("Cordoba VIII").

Carey Manor Limited ("Carey Manor") is a Virginia limited partnership formed to construct and own the Carey Manor apartment complex, which was to be built in Indianapolis, Indiana. Colonial Management Limited ("Colonial") is a Virginia limited partnership purportedly formed to provide all services necessary to the development, financing and operation of the Carey Manor apartment complex. Carey Manor

and Colonial together closed in the Fall of 1981.

It was represented to all investors that the limited partnerships would offer immediate tax shelter benefits, and eventually the projects would appreciate in value and could be sold for a profit. Affiliates of the Mark Companies were to be involved in the development, construction and management of the projects. These affiliates were paid substantial fees from the proceeds of the syndication. Mark Companies, the general partners, and the affiliates were wholly-owned by Joseph Griggs, III, and Larry J. Forth.

The Mark Partners, Gulf and Timberidge PPMs identified Faine, Harrell, Larmer & Co. as the accountants for these partnerships, and the Carey Manor/Colonial PPM identified Faine, Larmer & Co. as the accountants for the partnership. Each PPM represented that the firm had reviewed the financial projections contained in the PPMs and would prepare all audited statements for the partnership and all construction cost certifications for HUD. At all relevant times, Defendants Graham C. Larmer and Gregory V. Harrell were general partners of Faine, Harrell, Larmer & Co. At all relevant times, Larmer was a general partner of Faine, Larmer & Co. Hereinafter the two accounting firms will be referred to as "the Accountants".[1]

As of January, 1983, construction had not begun on any of the projects. The project sites had not been acquired in Timberidge and Carey Manor, and in Mark Partners one of the two sites had not been acquired. Moreover, the application for HUD insurance on each of the projects in question had expired. Certain Plaintiffs, pursuant to rescission provisions in the applicable partnership agreements and PPMs, requested the repurchase of their interests in the limited partnerships. These requests were ignored.

Plaintiffs initially filed suit on February 15, 1983. In their complaints, as subse-

---

1. W.T. Faine was, at all relevant times, a general partner of both firms. Mr. Faine is not a Defendant in these actions because he has received a discharge in bankruptcy.

quently amended, the Plaintiffs alleged violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Virginia Securities Act, the New Jersey Real Estate Syndication Offering Law and Uniform Securities Law of New Jersey, the Florida Securities Act, Pennsylvania Securities Act of 1972, Virginia common law, conspiracy, aiding and abetting and professional malpractice.

On January 5, 1984, this Court consolidated eight of the original cases into four pairs, each involving a single limited partnership. Other new cases involving different limited partnerships have been consolidated for discovery purposes only. A total of eighteen lawsuits are currently pending in this Court.[2] The four consolidated cases were scheduled to be tried, alternatively, on March 25, 1985. All claims against Defendant Griggs have been severed because he has filed under Chapter 7 of the Bankruptcy Act. Default judgments have been entered against certain corporate Defendants, and others have not been active in the suit.

The only remaining active Defendants are the Accountants and W.F. Mason, who served as the attorney to the Mark Compa-

nies. On February 20, 1985, the Accountants filed a Motion for Partial Summary Judgment on those counts in the eight consolidated actions which allege liability under the state security laws ("Blue Sky" laws) of Virginia, New Jersey and Florida. Mason joined in this motion.[3]

## II. *Issue Presented*

In their supporting Brief, the Accountants explained that the purpose behind their motion was to eliminate attorneys' fees as a potential item of damages. As of March 25, 1985, the principle amount of recovery sought by the Plaintiffs in the first four cases was $1,179,200. They also sought $255,857 in statutory interest (at 6%), $72,299 in expenses and $1,251,833 in attorneys' fees.

The various federal claims asserted by the Plaintiffs do not allow a recovery of attorneys' fees.[1] Interest, attorneys' fees and expenses are sought under the Virginia Securities Act, *Va. Code* § 13.1–522(a), which allows a purchaser of securities sold in violation of the Act to recover the "consideration paid for such security, together with interest thereon at the rate of 6% per annum, costs, and reasonable attorneys' fees ..."[5]

---

**2.** *Bell, et al v. River Towers, Ltd., et al,* No. 83–0990–R; *Clutter, et al v. Villa Del Sol, et al,* No. 83–0992–R; *Rosenberg, et al v. Mark Real Estate Fund Ltd., III,* No. 83–1015–R; *Fishman, et al v. Sugartree Ltd., et al,* No. 83–1017–R. The first eight of these lawsuits are brought by multiple purchasers of the "retail" partnerships. The remaining ten cases, each brought on behalf of one to three Plaintiffs, involve purchase of interests in the "wholesale" partnerships.

**3.** The Court orally communicated its decision on these Blue Sky motions on March 19, 1985. Defendant Mason then settled with the Plaintiffs. The Accountants and the Plaintiffs entered into a Stipulation of Settlement. In accordance with those stipulations, certain specific claims under the Virginia Securities Act were presented to the Court on April 1, 1985 in the consolidated *Timberidge* cases. Based upon the Court's resolution of those issues, judgment was entered for the Plaintiffs in those cases only. A petition for attorneys' fees under the Virginia Securities Act is now pending. The remaining cases have been set for trial.

**4.** The RICO counts have been voluntarily dismissed by the Plaintiffs, at least as to the first four cases.

**5.** § 13.1–522. *Civil liabilities.*—(a) Any person who:

(1) *Sells a security in violation of* § 13.1–502, § 13.1–504(a), § 13.1–507, § 13.1–510(e) or § 13.1–510(f), or

(2) Sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

Shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the rate of six percent per annum, costs, and reasonable attorneys' fees, less the

The Defendants allege that the Plaintiffs' claim for attorneys' fees is the major barrier to settlement of these suits. The Plaintiffs dispute this claim, and contend that reasonable settlement proposals have been made by the Plaintiffs at each stage of the litigation. Regardless of the past history of this case, it is obvious that the potential exposure of the Defendants is substantially higher when the claim for attorneys' fees is considered.

The Virginia Securities Act is patterned after an early version of the Uniform Securities Act. The civil liability provisions of *Va. Code* § 13.1–522 provide primary liability to those who "sell" a security in violation of the Act. Plaintiffs have alleged primary violations of the securities registration provisions, *Va. Code* § 13.1–507 and § 13.1–522(a)(1),[6] and the anti-fraud provisions, *Va. Code* § 13.1–502, § 13.1–522(a)(1) and (2).[7] There are also alleged violations of the statutory aiding and abetting provisions. *Va. Code* § 13.1–522(b). In these first four cases, almost all of the Plaintiffs reside in and executed their subscription agreements in New Jersey and Florida. Thus, the Plaintiffs have also filed claims under the non-registration, anti-fraud or aiding and abetting provisions of the New Jersey or Florida Blue Sky laws.

The Accountants argue that these multiple claims present a classic conflict of laws problem, because the scope and liabilities of the various state statutes are materially different. In the second half of their Briefs, the Defendants contend that the laws of Florida and New Jersey either do not reach their activities, do not allow recovery of attorneys' fees, or provide a short statute of limitations which would bar many of these Plaintiffs. Because these transactions involve several states, the Defendants believe this Court must first make a choice as to applicable law before determining liability.

Having assumed there is a conflicts problem presented, the Defendants proceed to argue which law should be applied. They suggest that the Plaintiffs' claims all sound in fraud and deceit; therefore, the Virginia conflicts doctrine for torts should be applied. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Virginia follows the traditional rule of *lex loci delicti*, and has rejected the most significant contacts test of the Restatement (Second) of Conflicts of Law. *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979). Applying that rule, the Defendants believe the place of the wrong is where the investors resided and suffered their losses, i.e. New Jersey or Florida.

The Plaintiffs have attacked this analysis on several different levels, contending that a *lex loci contractus* rule is more appropriate in securities fraud cases, and that regardless of the rule applied (place of con-

---

amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security.

(b) Every person who materially participates or aids in a sale made by any person liable under subsection (a), [or] who directly or indirectly controls any person so liable, shall also be liable jointly and severally with and to the same extent as the person so liable, unless the person who so participates, aids or controls sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

6. § 13.1–507. *Registration requirement.*—It shall be unlawful for any person to offer or sell any security unless the security is registered under this chapter or the security or transaction is exempted by this chapter. (Code 1950, § 13–110; 1956, c. 428.)

7. § 13.1–502. *Unlawful offers and sales.*—It shall be unlawful for any person in the offer or sale of any securities, directly or indirectly,

(1) To employ any device, scheme or artifice to defraud, or

(2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser. (1956, c. 428.)

tracting or place of the wrong), the facts of these transactions show that the "last act" occurred in Virginia where the general partner accepted the limited partner's subscriptions and closed the partnership. I do not need to consider these issues because I agree with the Plaintiffs' initial claim that there is no conflicts of law question presented.

## III. *Analysis*

Upon a review of the materials submitted and supplementary research, the Court has found no persuasive authority which has discussed whether traditional conflicts doctrine should be applied where the same activities may be governed by more than one statutory scheme. Both parties have relied upon a well known article by Professor Louis Loss, draftsman of the Uniform Securities Act, entitled *The Conflict of Laws and the Blue Sky Laws,* 71 Harv.L. Rev. 209 (1957), subsequently published in I Loss, *Securities Regulation* (1961). Loss suggested that the various provisions of the securities acts be distinguished. With respect to the anti-fraud provisions, Loss assumed that conflicts doctrine for common law fraud would be applied. Loss then carefully analyzed some 35–40 pre–1957 Blue Sky rescission cases based upon non-registration, and the various conflicts rules for contracts that had been applied. Recognizing the confused state of the law, Loss attempted to provide some guidelines through the drafting of § 414 of the Uniform Securities Act. Even under this provision, it is possible for the statutes of several states to overlap and reach the same transaction. Professor Loss has never discussed whether a true conflicts problem exists under these circumstances.

In spite of the prevalence of securities fraud actions, I am convinced that the federal statutes have overwhelmed discussion of the Blue Sky laws. The reported decisions cited by the parties are primarily cases which interpret whether or not the law of a particular state can apply to a particular transaction. *See, e.g., Green v. Weis, Voisin, Canon, Inc.,* 479 F.2d 462 (7th Cir.1973). Many of these cases are simply interpretations of or influenced by the jurisdictional approach of § 414 of the Uniform Act. *See Kreis v. Mates Investment Fund, Inc.,* 473 F.2d 1308 (8th Cir. 1973). But at no point have I found any discussion of whether two or more state statutes can simultaneously provide civil liability for securities fraud or non-registration. Even the Commentator of American Jurisprudence 2d states that there is no judicial authority regarding conflicts of laws between anti-fraud provisions. 69 Am.Jur.2d, *Securities Regulation—State* § 9.

Judge Warriner was confronted by this question in *American General Insurance Co. v. Equitable General Corp.,* 493 F.Supp. 721 (E.D.Va.1980), but his discussion is not very helpful. That case involved allegations of fraud and misrepresentation under federal law, the Texas Securities Act and the Virginia Securities Act. In a footnote at 493 F.Supp. 748, Judge Warriner assumed that there was a conflicts question to be decided based upon the place of contracting and performance. He concluded that the Texas Securities Act was applicable without discussing why the Virginia Act could not also apply.

The only discussion I have located on the question of whether two or more state statutes can simultaneously provide civil liability for securities fraud or non-registration is by Professor Joseph C. Long, in the *1985 Blue Sky Law Handbook.* Chapter 3 of this text is primarily drawn from his earlier article, *The Conflict of Laws Provisions of the Uniform Securities Acts,* 31 Okla.L. Rev. 781 (1978). Long deals exclusively with the Uniform Securities Act, particularly Section 414, and does not discuss the conflicts problem in states, like Virginia, which have not adopted § 414. Long notes, however, that common law rules have been greatly influenced by Section 414.[8]

8. Long, *1985 Blue Sky Law Handbook* at 3–3:

Nor is this chapter intended to suggest what necessarily should be the conflict of laws

Throughout his text, Professor Long declares that there is no conflicts problem presented when two or more state statutes reach the same transaction. His conclusion is drawn from the approach of the drafter of Section 414, Professor Loss.

The complexity of Section 414 stems from the combination of a number of factors. First, the area of conflict of laws, as a whole, is extremely complex and in a state of flux. Second, Professor Loss had to anticipate the varied multitude of transactions which might arise under the Act. Finally, Professor Loss's task was not the traditional conflicts task of determining when the laws of one state were to control over those of another, but rather to decide, based upon constitutional and policy grounds, when the securities laws of a particular state should attach to an individual transaction. As will be seen later, in contrast to the normal conflicts situation, these decisions may mean that the laws of two or more states will become applicable to a single transaction.

Probably the best illustration of this last point is the case of *Neils v. Black & Co.*, [1971–78 Transfer Binder] Blue Sky L.Rep. (CCH) ¶ 71,017 (D.Or.1972). In this case, the registered representative of Black & Company, located in the state of Washington, called his client, located in the state of Oregon, advising him that a California corporation named Nova Tech had securities available for purchase. The client then called the corporation in California from his home in Oregon and purchased some of these securities. As a result of this purchase, Black & Company received a finder's fee. The court held that the Oregon securities law applied, but could have also applied either the Washington or the California acts. Long, *1985 Blue Sky Law Handbook*, 3–2, 3–3.

This "territorial" approach is best understood in the context of the multiple policy objectives behind state securities laws.

There would appear to be two policy bases that could be used by a state for enacting a state securities act. First, the state has a legitimate interest in protecting its citizens in the purchase or sale of securities. The state likewise has a legitimate interest in regulating and controlling securities activities deemed to have taken place at least partially within the borders of the state. *North Star Int'l v. Arizona Corporation Commission*, 720 F.2d 578 (9th Cir.1983). In most cases these policy bases will overlap and lead to the same conflict of laws conclusions. Thus, it is clear under either basis that the law of Oklahoma will control transactions which physically take place in Oklahoma between two or more Oklahoma residents or citizens.

However, there are situations where the two policy justifications for the securities acts may lead to opposing conflict of laws rules. If, for example, the justification is the protection of its own citizens or residents alone, then the state should have little or no interest in regulating a transaction which happens to take place physically within the state, but between two or more foreign citizens or nonresidents. Correspondingly, the state would have an interest in protecting its citizens when they enter into transactions in other states. Thus, the United States government seeks to protect the interests of American citizens when they travel abroad, and the English courts have often concluded that English law follows the English traveler abroad. On the other hand, if the justification is merely to control securities transactions within its borders, the state has no legitimate interest in applying its laws to transactions involving its citizens which

rules in those states which have not adopted Section 414 or an equivalent statute. These states must continue to solve their conflicts question by reference to common law rules. *See, e.g., Allen v. Smith & Medford, Inc.*, 129

Ga.App. 538, 199 S.E.2d 876 (1973). These common law rules have been heavily influenced by the provisions of Section 414 of the Uniform Act. *See, e.g., Green v. Weis, Voisin, Cannon, Inc.*, 479 F.2d 462 (7th Cir.1973).

take place entirely outside the borders of the state.

In actuality, most state securities laws are enacted for both reasons, leaving the question of what is the appropriate scope of the coverage of such acts. It has often been stated that the state blue sky laws are not to be given extraterritorial effect. *See, e.g., Singer v. Magnavox Co.,* 380 A.2d 969 (Del.1977). Yet, is this statement the result of a conscious decision by the various states that such statutes should not be given such effect, or, is it a product of the prevailing constitutional, conflict of laws, or international law rules? It is beyond the scope of this chapter to examine this intriguing question in detail because it is clear that the draftsmen of the Uniform Act consciously elected to limit the scope of the Uniform Act to those transactions which took part at least partially within the state.

*Id.* at 3–5, 3–6.

These policy objectives support Professor Long's earlier assertion that so long as there is some territorial nexus to a particular transaction, the laws of two or more states may simultaneously apply. Later in his text, Long provides examples of how a sale may comply with the laws of the seller's state, yet be illegal in the purchaser's state, and entitle the purchaser to rescission. Unfortunately, Professor Long never confronts the question of whether conflicts of law principles should be applied in such a situation. *Id.* at 3–7.[9] In short, this Court seems to be faced with a question of first impression.

I believe that the Defendants are incorrect in viewing this as a conflicts of law question. They accept an unduly narrow view of the authority of the state to regulate securities transactions which have a nexus to the state. Virginia, like other states that have substantially adopted the Uniform Act, has a comprehensive scheme for the regulation of securities. The statute is intended to govern those who sell securities within the state even though incorporated elsewhere and never entering into the state. *Travelers Health Association v. Commonwealth,* 188 Va. 877, 51 S.E.2d 263 (1949), *aff'd.,* 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). The provisions of *Va.Code* § 13.1–522 are quite broad, imposing civil liability on any person who sells a security in violation of § 13.1–502 (the anti-fraud section), § 13.1–504(a) (broker-dealer registration), § 13.1–507 (making it unlawful to "offer or sell a security unless the security is registered under this chapter"), and other sections.

It has been suggested that the only limitation on the reach of the statute is that the state have a real nexus to the transaction, i.e. that one or more of the prohibited actions occur in the state. *See Loss, supra,* 71 Harv.L.Rev. 242 ("in this state" is an implied limitation on the scope of the statute). Section 414 of the Uniform Securities Act is thus helpful as a guide to when a transaction occurs within this state so that the statute is applicable. But in no sense is it a "conflicts" provision, nor should it be.

As explained above by Professor Long, there are legitimate policy objectives be-

---

**9.** Long, *1985 Blue Sky Law Handbook* at 3–7.
   As noted, the drafters of the Uniform Act consciously rejected citizenship or residence within a particular state as the policy base for the application of the Uniform Act. Instead they elected a territorial base, requiring that the transaction have some physical nexus with the state. Thus, the offer, sale, or purchase of the security must originate from the state, or be directed into the state. Violation of the blue sky laws normally results in civil liability upon the part of the violator. Section 410. This cause of action for violation of the Securities Act would seem clearly to be a transitory cause of action which could be en-

forced by the courts of another state, if normal jurisdictional requirements are satisfied. When a transaction is determined to involve two or more states, it is possible that the transaction may be legal under one statute, but illegal under the statute of the second state. In such case a conflicts question arises as to which law should control. *See* A. Ehrenzweig, *Conflict of Laws* 416 (1962).
   Long never explains *why* a conflicts question arises in such a case, or how it should be resolved. His perfunctory conclusion appears to be at odds with his subsequent analysis of the Uniform Securities Act.

hind the enactment of Blue Sky laws. One of these objectives is to govern the actions of those operating within the borders of the state. *Long, supra* at 3–36, 3–37.

■ If the allegations in the Complaints are true, then the Defendants, operating from Roanoke, Virginia, sold securities to non-residents without registering them and through fraud or misrepresentation. Such actions are unlawful, and if made with an intent to defraud could be prosecuted as a class 4 felony. *Va. Code* § 13.1–520. It cannot be disputed that Virginia has a legitimate interest in applying its securities laws to operations conducted within the state, even if aimed at non-residents. *Enntex Oil & Gas Co. v. Texas,* 560 S.W.2d 494 (Tex.Civ.App.1977). And if the General Assembly chooses to regulate these transactions through the imposition of statutory civil liability in addition to criminal liability, it is free to do so.

■ The same analysis can be applied to the Blue Sky laws of New Jersey, Florida or any other state. If upon application of the facts a transaction is found to be covered by the statutory scheme developed by those states, then the penalties imposed by those statutes can be applied. I see no reason why a conflicts of law problem develops if one Blue Sky law provides fewer remedies, lacks an attorneys' fee provision, has a shorter statute of limitations or has a more limited scope than the law of another state. Just as the same act can violate both federal and state law simultaneously, or a state statute as well as state common law, so too can it violate several Blue Sky laws simultaneously. There is nothing inconsistent in trying a securities case on multiple theories, and determining liability under each statute that is applicable, so long as the plaintiff is prevented from multiple recoveries.

The common sense of this approach can be most clearly seen in the registration provisions. It has become routine for securities to be registered in each state where broker-dealers solicit sales. Many cases have held that the failure to register in a state where a security is sold, even if that security is registered elsewhere, will allow the purchaser to rescind the sale under that state's law. *See Kreis v. Mates Investment Fund,* 473 F.2d 1308. The logical extension of this idea is that if the security is not registered in *any* state, a sale can be rescinded under any statute which reaches the transaction involved. The same logic applies to the anti-fraud provisions of the Blue Sky laws. Even if the security is registered, a sale can be rescinded if procured through fraud. The registration and anti-fraud provisions are part of a unified statutory scheme, and liability is imposed regardless of which section is violated. I can see no reason to differentiate between the registration and anti-fraud provisions.

## IV. *Conclusion*

This decision does not resolve whether the Accountants or Mason are actually liable under the Virginia Securities Act. Numerous other issues, including the scope of aiding and abetting liability, must still be considered based upon the facts of each case. The Defendants have raised this conflicts question because the civil liability provisions of the Virginia Act allow for the recovery of "reasonable attorney's fees" to successful plaintiffs while they believe the laws of New Jersey and Florida either do not allow for such recovery, or are narrower statutes than Virginia's and less likely to reach their activities. I have concluded that there is no conflicts of law question presented by these overlapping statutes, and that the Virginia Act does apply. Plaintiffs' counsel has represented to the Court that if this decision is reached, he will move to dismiss the claims under other state Blue Sky laws. Therefore, I need not address the scope of those statutes.