**PIONEER MILITARY LENDING, INC.,**
Appellee/Cross–Appellant,

v.

**Earl L. MANNING, Commissioner, Division of Finance, Appellant/Cross–Appellee.**

Nos. 92–2671, 92–2672.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1993.

Decided Aug. 11, 1993.

Rehearing Denied Sept. 9, 1993.

Carol L. Iles, Jefferson City, MO, argued, for appellant.

Dan Moreles, Will Pryor, Mary F. Keller, Joe K. Crews and Richard Tomlinson, Houston, TX, for amici curiae.

George E. Leonard, Kansas City, MO, argued, for appellee.

Before LOKEN and HANSEN, Circuit Judges, and MURPHY,[*] District Judge.

DIANA E. MURPHY, District Judge.

This case involves the attempt by the Missouri Commissioner of Finance, Earl L. Manning, to impose certain laws for small loan companies upon Pioneer Military Lending, Inc. (Pioneer), a Nebraska corporation. The district court ruled that application of the Missouri regulatory scheme to Pioneer would place an undue burden on interstate commerce in violation of the Constitution, and the Commissioner appealed. Pioneer in turn

[*] The Honorable Diana E. Murphy, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

appeals from that part of the judgment which dismissed its claim under 42 U.S.C. § 1983.[1]

## I.

The district court based its findings on a lengthy joint stipulation of facts and a one day trial at which four witnesses testified.

Pioneer is a Nebraska corporation whose business entirely consists of making loans to military personnel. It conducts business throughout the United States, some of it by mail or telephone, and some of it through full-service or satellite offices. It has an agency agreement with Dick Jones of Woods–Jones Associates to operate a satellite office in Rolla, Missouri. The Woods–Jones office assists Pioneer in making expedited loans through Pioneer's "Redi–Loan" program. Pioneer also operates this program in Nebraska and Kansas and plans to expand it to the other 45 states with military installations.

Pioneer makes expedited loans to military personnel stationed in Missouri at Fort Leonard Wood who are not state residents. The Woods–Jones office receives calls from potential borrowers and completes loan applications. It obtains copies of a potential borrower's military identification and leave and earning statements, and transmits these documents via facsimile to Pioneer's office in Bellevue, Nebraska.

If Pioneer approves a loan, it sends copies of promissory notes, security agreements, and checks from Nebraska to the Woods–Jones office by Airborne Express. The Woods–Jones office informs the applicant of the decision, and arranges for the applicant to come to the office to sign the notes and pick up the check. The documents are then sent back to Pioneer.

Borrowers, who are frequently transferred to another state before fulfilling their loan obligations, repay Pioneer by one of three methods. Approximately 60% of the Fort Leonard Wood borrowers use the Military Allotment method, by which the military deducts the repayment sum from the borrower's paycheck. The funds are transferred to Citizen's Fidelity Bank of Elizabethtown, Kentucky, which in turn transfers the payments to Pioneer upon receiving authorization from the borrower. Another 30% of the Fort Leonard Wood borrowers use the Easy Funds Transfer method, by which the borrower authorizes Pioneer to initiate a debit against a preauthorized bank account. The remaining borrowers repay by mail, using a monthly coupon system.

Pioneer keeps the promissory notes, loan documents, and loan records in its Bellevue, Nebraska office at 1605 Galvin Road. These records include information about the amount of each loan, its term, finance charges, additional points charged, origination fees, other loan fees, the annual percentage rate, and the type of collateral.

Pioneer maintains its loan records in compliance with Nebraska law. The Nebraska Department of Banking and Finance has the right, under Nebraska law, to review Pioneer's loan records, including loans to military personnel who were stationed in Missouri when the loan was made. The Nebraska Department of Banking and Finance has exercised this right by auditing Pioneer on May 7, 1990, and again on January 16, 1991.

Nebraska regulations on the interest rates and fees allowable differ in a number of respects from the Missouri regulations. The stipulation of the parties indicates that loans made at the maximum rate and fees permitted under Nebraska law would have higher annual percentage rates, monthly payments, and finance charges than under the maximum permitted by Missouri law. On the other hand, late charges are permitted under Missouri law but not by Nebraska.

The Commissioner is responsible for licensing and regulating consumer credit lenders in the state of Missouri. On July 3, 1990, he instructed Pioneer to cease and desist making loans in the state unless it complied with state law regarding registration, records, and fees. The Commissioner demanded compliance in connection with the loans

---

1. Count III of the amended complaint was also dismissed as duplicative or vague; Pioneer has not appealed this ruling.

made through the Redi–Loan program. He did not seek to enforce the regulations with regard to any loans made solely through the mails, which he concedes are not loans made in Missouri.

Compliance with Missouri law would involve Pioneer's obtaining a certificate of registration, maintaining records in compliance with the law and regulations, and subjecting its operation to examination by the Commissioner. *See* Mo.Rev.Stat. §§ 367.100 *et seq.* In addition, Missouri law restricts interest rates and fees chargeable to the borrower. *See* Mo.Rev.Stat. §§ 408.100 *et seq.* Lenders with certificates of registration are subject to examination by the Commissioner, obligated to keep business books and records in the state, and bound by restrictions on interest rates and fees. Joint Stipulation ¶ 23, App. at 39.

The district court found that to comply with Missouri law, Pioneer would have to establish a full-service office in the state. It would cost $89,100 initially to start up a full-service operation and approximately $123,000 per year to maintain it. Thus, in the first year Pioneer's cost for a full service operation would exceed $210,000. Pioneer's current Missouri office operates at an expense of less than $24,000 per year. The district court found that the volume of Pioneer's business in Missouri was not large enough to maintain a profitable full-service office.

The Commissioner contended that Pioneer could satisfy the state's regulations by putting on the payroll one loan officer familiar with Missouri's requirements and responsible for seeing that these requirements were met. There was testimony, however, that even the addition of a single employee would have the practical effect of closing Pioneer's operation in Missouri. The district court considered this alternative and found it unfeasible.

There was conflicting evidence about the nature and extent of Pioneer's competition.

The Commissioner brought out evidence which indicated that there is some competition for military loans in Missouri. Other lenders who make loans to personnel at Fort Leonard Wood maintain their records in Missouri and are examined for compliance with Missouri law. Pioneer presented evidence that it is the sole company in Missouri that only lends to military personnel. Pioneer is also the only company, other than used car dealers who provide their own sales financing, that offers loans to personnel in the lowest pay grades. (Tr. at 7). The district court did not make any finding specifically dealing with the extent or effect of Pioneer's competition in Missouri.

In the district court, the Commissioner clearly identified two interests the state of Missouri has in applying its loan laws to Pioneer.[2] He argued that Missouri has an interest in protecting its residents from usurious interest rates. The district court found this interest to have no application in this case. The undisputed evidence was that Pioneer made loans only to non-residents, and there was no evidence that Pioneer's operation was a sham or that it had any direct effect on Missouri residents. The Commissioner also argued that Missouri has an interest in protecting its reputation as a state which provides equal protection to everyone within its borders. There was no evidence presented, however, to show that Missouri's reputation would suffer if it were not able to apply its regulations to Pioneer's Fort Leonard Wood operation. The district court found that there was little legitimate local interest in the regulation of Pioneer.

The district court found that the start-up and annual costs of operating an office in Missouri would effectively preclude Pioneer from continuing to serve the Fort Leonard Wood market. These costs would place a burden upon interstate commerce. The district court concluded that the resulting burden on interstate commerce from application

---

2. The Commissioner argues he also raised a third interest: the state's interest in preventing non-resident corporations from obtaining a business advantage not available to other companies making loans to military borrowers in Missouri. His answer to an interrogatory about Missouri's interests stated: "Pioneer is not entitled to any competitive or business advantage not granted equally to all others making loans to military borrowers in this state." Joint Stipulation ¶ 17, App. at 37.

The district court did not discuss this point which might have been construed as a part of the state's asserted interest in equal protection.

of the Missouri regulatory scheme to Pioneer outweighed the local interests of Missouri, and therefore violated the Commerce Clause. U.S. Const. Art. I, § 8, cl. 3. The district court also concluded that Pioneer could not seek relief for the Commerce Clause violation under 42 U.S.C. § 1983. The Commissioner appealed, and Pioneer cross-appealed.

## II.

The Commerce Clause authorizes Congress to "regulate commerce . . . among the several states . . ." U.S. Const. Art. I, § 8, cl. 2. Even where Congress has not exercised its authority under the Commerce Clause, it bars state regulations which unduly burden interstate commerce. *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). A state regulation which does not directly discriminate against interstate commerce will be upheld unless the burden it places on interstate commerce outweighs the local interests promoted by the law. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

The Commissioner argues that the district court incorrectly assessed the burden Missouri's small loan laws put on interstate commerce. He contends that the district court too narrowly focused on the effect the regulations had on Pioneer when determining the burden the regulation placed on interstate commerce. He relies on a statement in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978), that the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." He argues that this principle makes irrelevant the particular burden that Missouri's regulations placed on Pioneer. The Commissioner further contends that the finding of the district court about the extent of any burden on interstate commerce was clearly erroneous.

Pioneer argues that the impact the small loan laws would have upon its interstate activities is relevant to the determination of the burden placed upon interstate commerce. It also contends that the evidence supports the findings that the cost over the first year of a full service office would exceed $200,000 and that there would be an annual cost of over $100,000 thereafter. The increased costs would result from necessary addition of staff and automated equipment. (Tr. at 10, 51).

The burden a state regulation places on a single firm's interstate activities can be excessive under the Commerce Clause. For example, in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the court held invalid an Arizona regulation that required Arizona growers to package their fruits within the state. Plaintiff grew cantaloupes in Arizona and packaged them in a California facility approximately 30 miles away. It would have cost approximately $200,000 to put up a packaging facility in Arizona. The Court found this burden put "a straitjacket on the . . . company with respect to the allocation of its interstate resources."

*Exxon* neither overruled *Pike*, nor made irrelevant the burden that a state regulation places on an individual business. The statement in *Exxon* on which the Commissioner relies merely emphasizes that the burden placed on any individual firm should be regarded in the context of the overall interstate market. The lending market which Pioneer targets is a transient one; military personnel are subject to relocation at the direction of the Department of Defense and may have difficulty establishing credit due to their moves. (Tr. at 43–44). Pioneer does business throughout the country. The evidence at trial showed that its business would be adversely affected if it had to comply with differing state laws, wherever military personnel are stationed, as to fees, rates, collections, and the maintenance of records. (Tr. at 11–20). The district court did not err by considering the impact that the Missouri loan laws would have on Pioneer in respect to its interstate resources in evaluating the issue of burden on interstate commerce.

The district court found the burden on interstate commerce to consist of the preclusive costs Pioneer would face to establish and maintain a full-service operation in Missouri. In the context of the overall market for

military loans as presented by the evidence at trial, this finding was not clearly erroneous. *See Colorado Milling & Elevator Co. v. Terminal R.R. Ass'n of St. Louis*, 350 F.2d 273 (8th Cir.1965), *cert. denied*, 382 U.S. 989, 86 S.Ct. 563, 15 L.Ed.2d 476 (1966). Although there was evidence that other companies made loans to military personnel in Missouri, including Beneficial Missouri, Inc., there was also evidence that Pioneer was the only company to provide loans to personnel in the lowest pay grades. There was evidence that Pioneer serviced a unique niche in the market and that the imposition of Missouri's regulations would force Pioneer to discontinue its operation, thereby leaving a gap where that niche existed.

On appeal the Commissioner asserts three interests the state of Missouri has in the application of its small loan laws to Pioneer's loans to non-resident military personnel stationed in Missouri.[3] He claims that the state has an interest 1) in protecting its residents from usurious interest rates and oppressive lending practices; 2) in protecting its reputation as a state which provides equal protection; and 3) in preventing Pioneer from obtaining a competitive advantage over other companies making loans to military personnel. He argues that the district court gave improper weight to the first two interests and failed to consider the third.

Pioneer argues that the interests asserted by the Commissioner are tenuous at best. It points out that Missouri does not seek to protect its own residents from lenders who transact business solely through the mail, and maintains that there is a dispute about whether Missouri or Nebraska law provides superior protection to borrowers. It argues

that the state interests asserted in this case are less than those found in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and that the Supreme Court opinion in that case should therefore control the outcome.

Missouri does have an interest in protecting its residents from usurious interest rates and oppressive lending practices. *See Aldens, Inc. v. Miller*, 610 F.2d 538, 540 (8th Cir.1979). Since only non-residents can get expedited loans from Pioneer, however, its interest rates would have no effect on Missouri residents. There was no evidence that Pioneer's operations are a sham designed to circumvent Missouri·law or that any Missouri resident would be subject to higher interest rates as a result of Pioneer's activities. The district court found Missouri's interest in protecting its residents from usurious interest rates to have no application in this case. The findings of the district court on this point were not clearly erroneous.

Missouri also states that its "reputation as a state which provides equal protection to all who live within its boundaries is at stake." Joint Stipulation ¶ 17, App. at 37. The district court found that there was no evidence to support the contention that Missouri's reputation would be hurt by Pioneer's activities. This finding is supported by the evidence, or lack of it. The Commissioner did not establish what real interest, if any, Missouri has in protecting a non-Missouri resident from the activities of a lender regulated by a sister state. *Cf. Edgar v. MITE Corp.*, 457 U.S. 624, 644, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (state has no interest for purposes of

---

**3.** Texas, Iowa, South Carolina, and Arkansas appeared on appeal as amici curiae in support of the Commissioner. They fear that the outcome of this case could affect the interpretation of their consumer credit and consumer protection statutes. They express concern about the possible impact on their ability to enforce anti-fraud and consumer protection laws against businesses located within the state which solicit business from non-residents.

The cases they cite turn on quite different facts, however. *E.g. Aldens, Inc. v. Miller*, 610 F.2d 538 (8th Cir.1979) (state has interest in regulating solicitations directed at state residents); *Lintz v. Carey Manor Ltd.*, 613 F.Supp. 543, 551

(W.D.Va.1985) (state has interest in preventing businesses located in state from committing fraud directed elsewhere); *Upton v. Trinidad Petroleum Corp.*, 468 F.Supp. 330, 335 (N.D.Ala. 1979) (state has reasonable interest in preventing it "from being used as a base for fraudulent activities …").

There is no evidence in this case that Pioneer's operations are a sham or fraudulent. Nor does this case present a situation where a business is unregulated by any jurisdiction.

The generalized concerns raised by amici appear to be merely speculative under the particular circumstances of this case.

Commerce Clause in protecting non-residents under securities laws).

Missouri also asserts an interest in assuring that Pioneer is not given a competitive business advantage not available to others making loans to military borrowers in this state. Missouri argues that Pioneer will have a competitive advantage over Missouri companies if it is free to charge the higher interest rates and fees permitted by Nebraska. The record indicates that Pioneer partly services a unique niche of the military loan market by providing loans to the lowest rank personnel otherwise unable to obtain loans from Missouri lending companies. To the extent that Pioneer does compete with resident loan companies, however, the record does not reveal any specific competitive business advantage it might have over such competitors. Furthermore, the Commissioner concedes that Pioneer could provide loans to any military personnel through the mails without application of the state's small loan laws. The interest of Missouri in preventing this non-resident loan company from obtaining a competitive advantage is slight on the record presented.

In sum, the burden Missouri's small loan laws would place on interstate commerce when applied to Pioneer's operation is great compared to the relatively slight local interests served by imposition of its regulatory scheme to Pioneer's loans to non-residents stationed at Fort Leonard Wood. Accordingly, the judgment with respect to Count I of the amended complaint should be affirmed.

### III.

Pioneer appeals from that portion of the judgment which dismissed its claim in Count II under 42 U.S.C. § 1983. It argues that *Dennis v. Higgins*, 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), recognized a cause of action under § 1983 for Commerce Clause violations and that it was error for the district court to dismiss this claim. In its appellant brief, Pioneer asks for remand for an evidentiary hearing to determine damages.

The Commissioner argues that the § 1983 claim is moot if Pioneer receives declaratory relief under Count I for violation of the Commerce Clause and that Pioneer did not seek damages in its amended complaint or at trial. Pioneer responds that the § 1983 claim is not moot, that the findings and conclusions in Count I require entry of judgment in its favor on Count II under *Dennis*, and that the case should be remanded and attorney fees should be awarded under 42 U.S.C. § 1988.

*Dennis* held that the Commerce Clause confers "rights, privileges or immunities" which § 1983 protects. 498 U.S. at 445, 111 S.Ct. at 870. The district court reasoned that the factual situation here could be distinguished from that in *Dennis*, but the Supreme Court's decision should not be read too narrowly. This court has subsequently followed *Dennis* in holding that Commerce Clause plaintiffs have a cause of action under § 1983. *Waste Systems Corp. v. County of Martin*, 985 F.2d 1381, 1389 (8th Cir.1993). The judgment dismissing this claim should be reversed, and the trial court should have the opportunity to consider the relief requested.[4]

---

**4.** In remanding, we express no view as to whether an award of attorney fees under 42 U.S.C. § 1988 would be appropriate in this case. One who obtains relief under § 1983 "should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942 n. 1, 103 L.Ed.2d 67 (1989) quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). After *Dennis*, it is clear that attorney fees may be available in Commerce Clause cases under 42 U.S.C. § 1988, but that does not mean they are necessarily recoverable. *See Dennis*, 498 U.S. at 462–65, 111 S.Ct. at 879–80 (Kennedy, J. dissenting and expressing concern

that dormant Commerce Clause plaintiffs typically have sufficient resources to litigate without fee shifting statute); *BFI Medical Waste Systems v. Whatcom County*, 983 F.2d 911 (9th Cir.1993) (remanding fees issue in Commerce Clause case for consideration of specific factors relevant to § 1988).

Section 1988 expressly makes a fees award discretionary, and the Supreme Court has stated that "[i]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." *Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992). On remand the district court should consider whether fees are recovera-

## IV.

In conclusion, the judgment of the district court awarding Pioneer declaratory relief under the Commerce Clause in Count I is affirmed, but the judgment of dismissal on Count II is reversed and the matter is remanded for further proceedings on Pioneer's § 1983 claim.

ble here, and if so, what amount would be reasonable. The degree of success is "the most critical factor" in determining the reasonableness of a fee award. *Hensley v. Eckerhart* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Relevant factors in determining the degree of success obtained include, but are not necessarily limited to, "the extent of relief, the significance of the legal issue on which the plaintiff prevailed, and the public purpose served." *Farrar,* —— U.S. at ——, 113 S.Ct. at 579 (O'Connor, J. concurring).