**PETE'S BREWING COMPANY,
et al., Plaintiffs,**

v.

**Hope E. WHITEHEAD, in her official capacity as Supervisor of the Missouri Division of Liquor Control, et al., Defendants.**

No. 97–1528–CV–W–1.

United States District Court,
W.D. Missouri,
Western Division.

Sept. 10, 1998.

Jennifer Gille Bacon, William E. Quirk, George E. Leonard, Shughart, Thomson & Kilroy, Kansas City, MO, for plaintiffs.

Andrea Spillars, Kurt U. Schaefer, Missouri's Atty. General's Office, Jefferson City, MO, Dan Conley, Quarles & Brady, Milwaukee, WI, for defendants.

## ORDER

WHIPPLE, District Judge.

Pending before the Court is Plaintiffs' Complaint for declaratory judgment and injunctive relief. Plaintiffs seek to permanently enjoin the enforcement of Missouri Revised Statute § 311.360.2. The parties agreed that this case would be tried to the Court. A hearing on the merits was conducted on February 5, 1998. The findings of fact and conclusions of law in this Order are based upon the evidence received at that trial and the post-trial briefs submitted by the parties.[1] For the following reasons, Plaintiffs motion for a permanent injunction is GRANTED.

## I. FINDINGS OF FACT

1. The Court accepts the Stipulation of Facts [Doc. 92] submitted by the parties. The Court adopts and incorporates those findings of fact into this Order. Some of those acts are restated below in an effort to emphasize their importance and to add continuity to this Order. The Court has also made additional findings of fact which were not included in the parties stipulations but

---

1. Although Anheuser–Busch (A–B) is not a party to this case, (Court Order of December 15, 1997, denying A–B's motion to intervene), the Court has allowed A–B to participate *amicus curie.* In issuing this Order, the Court has also considered post-trial brief, accompanying affidavits, and the post-trial reply brief of A–B.

are based upon the evidence which has been submitted to the Court.

2. Plaintiffs are all out-of-state producers or importers of beer that is sold in Missouri.

3. In the Spring of 1996, the Missouri Legislature passed Senate Bill 933 which was subsequently codified as Missouri Revised Statute § 311.360.2. (Supp.1998).

4. Section 311.360.2, provides:

Any malt liquor which is offered for sale in this state and manufactured at other than a facility owned by the person whose name appears on the label of the container shall include on the label the name and location of the owner of the facility which produced and packaged the malt liquor. This subsection shall become effective January 1, 1997.

5. Malt liquor is defined at 11 CSR 70–2.010(3) as:

[A]ny beverage manufactured from pure hops or pure barley malt or wholesome grains or cereals and wholesome yeast and pure water, containing alcoholic excess of three and two-tenths percent (3.2%) by weight and not in excess of five percent (5%) by weight.

6. To clarify the terms "owner" and "facility" in § 311.360.2, the Supervisor of the Missouri Department of Liquor Control (the Supervisor) filed an emergency amendment and permanent amendment to 11 CSR 70–2.060 on November 21, 1996, to become effective December 31, 1996, which states:

(1) [I]f the name of the brewer or manufacturer of malt liquor which appears on the label is not the owner of the facility where the malt liquor was brewed or manufactured, then the name, owner and address of the facility shall also be set forth on the label.

\* \* \* \* \* \*

(7) For purposes of this regulation the following definitions apply:

(A) A "facility which brews or manufactures malt liquor" is defined as a brewery or manufacturing plant premises licensed by either, or both, the state within which it is located and/or the United States Federal Alcohol Administration; and

(B) An "owner" of a facility which brews or manufactures malt liquor is defined as a person, corporation, limited liability corporation, partnership or other legal business entity, who holds the entire facility in fee simple, or has a leasehold interest for a term of years in that entire facility, and is the person or business entity licensed for that entire facility by either or both, the state within which the facility is located and/or the United States Federal Alcohol Administration.

7. The stated purpose of the amendment to 11 CSR 70–2.060 was as follows:

This Emergency Statement is necessary to provide for the appropriate and timely direction of the brewing industry in the implementation of legislation requiring malt liquor containers to bear the name and address of the owner of the facility of brewing or manufacture on the label if that person is other than the declared label manufacturer or brewer. That legislation, enacted by Senate Bill 933, 88th General Assembly becomes effective on January 1, 1997. Consumers of malt liquor in the State of Missouri are entitled to know the identity of the brewer or manufacturer of an alcoholic beverage sold in Missouri. Likewise, malt liquor brewers and manufacturers require notice of the State's labeling standards within a sufficient time so as to be able to ensure timely compliance with statutory obligations imposed the General Assembly. Failure to implement this Emergency Rule would deprive Missouri consumers of appropriate and correct label information regarding a product (beer) commonly consumed by a large portion of the buying public and place certain members of the alcoholic beverage industry at risk for non-compliance[.]

8. The Supervisor determined that pursuant to § 311.360.2, malt liquor labels which list a fictitious trade name as the owner of the facility which produced and packaged the malt liquor did not comply with § 311.360.2.

9. On December 19, 1996, the Supervisor sent a memo to all manufacturers solicitors, and wholesalers of malt liquor licensed by

the Missouri Department of Liquor Control (MDLC) informing them that § 311.360.2 was to become effective January 1, 1997. The memo included a copy of § 311.360.2 and 11 CSR 70–2.060.

10. The MDLC has thousands of labels on file going back to the 1940's.

11. A manufacturing license issued by the MDLC allows the licensee to produce beer in Missouri and a solicitors license allows the licensee to sell beer in Missouri to a licensed wholesaler. Mo. Rev. Stat. § 311.180

12. Manufacturers and solicitors are not required to notify the MDLC when they discontinue using a label. Therefore, many of the labels on file with the MDLC are no longer in use.

13. On April 7, 1997, the Supervisor sent a memo, to all manufacturers and solicitors requesting that they submit to the MDLC labels they are using which had been approved prior to January 1, 1997.

14. The April 7, 1997, memo did not require manufactures and solicitors to submit numerous other documents which they are required to submit to the MDLC when seeking label approval.

15. The purpose of the April 7, 1997, memo was to determine what labels were actually in use in Missouri, not to make a final determination on which labels comply with § 311.360.2.

16. By June, 1997, most solicitors had complied with the April 7, 1997, memo.

17. In response to the April 7, 1997, memo the MDLC received approximately 1,400 labels.

18. In July, 1997, the Supervisor met with several of the Plaintiffs, at their request, to discuss enforcement of § 311.360.2 and one week later she met with representatives from A–B to discuss the same issues.

19. On September 17, 1997, the Supervisor sent a letter to all manufacturers, solicitors, and wholesalers licensed by the MDLC stating that she had an enforcement strategy for § 311.360.2, but would not begin enforcing the law until after the Missouri Supreme Court issued its opinion in *Stroh Brewery Co. v. State*, 954 S.W.2d 323 (Mo.1997) (en banc).

20. On October 21, 1997, the Missouri Supreme Court issued its opinion in *Stroh Brewery Co. v. State*, 954 S.W.2d 323 (Mo. 1997) (en banc).

21. On November 10, 1997, the Supervisor sent a letter to all licensees of the MDLC stating that she would begin enforcing § 311.360.2 on December 10, 1997.

22. By November 10, 1997, the Supervisor still had not notified any licensee whether their labels were actually in compliance with § 311.360.2.

23. On November 19, 1997, the Supervisor sent a letters to Plaintiffs Pete's Brewing Company (Pete's) and Miller Brewing Company (Miller) informing them that some or all of their labels might not comply with § 311.360.2 and that they should submit documentation to the MDLC establishing that their labels comply.

24. This was the first notice these companies received that their labels might not comply with § 311.360.2, even though enforcement of this statute was scheduled to begin in twenty-one days.

25. Neither Pete's nor Miller supplied the requested documentation to the MDLC. Instead, they filed their Complaint and request for declaratory judgment in this case on November 21, 1997.

26. The MDLC has not approved or rejected any labels under § 311.360.2 nor has the MDLC issued any violation orders for violations of § 311.360.2.

27. Marketing experts describe the beer industry as a mature or static market. It is a highly competitive industry which experiences little growth and is saturated with competitors. Consequently, for a company to increase sales it typically has to gain market share or take sales away from a competitor. This may be contrasted with the computer industry where companies attempt to find new markets and new customers instead of targeting their competitors customers.

28. During the 1960's and 1970's the beer market experienced increasing concentration. A small number of large national breweries came to control most of the industry. Begin-

ning in the mid–1980's a trend emerged where "speciality," "craft," or "micro" beers started to emerge. This segment of the market experienced significant growth in the early 1990's. Since the mid–1980's the number of beer producers has exploded from around I 00 to over 1,500. While the number of beer producers has expanded sharply, the "craft" brew segment still only occupies 2.5% to 4% of the total beer market.

29. While definitions of "craft," "speciality," and "micro" differ, the market is in agreement that all of these types of beer differ from "mainstream" beers. Mainstream beers still account for over 90% of market sales, with A–B, Miller, and Coors accounting for about 88% of the national market.

30. In the beer industry there is a practice known as contract-brewing. Some breweries are able to produce more beer then their owner can sell. These breweries have excess capacity. Other companies are able to sell more beer than their facilities can produce, or they simply do not have a brewery. While these "smaller" brewers have their own recipe and method of brewing, economies of scale may make it more profitable for them to rent space at larger facilities, who have excess capacity, and brew their beer there.

31. Trade names are also used in the beer industry. Companies may register a name with the Secretary of State and engage in business using that factious name. This practice is not unique to the beer industry. For instance, Saturn is one of the many trade names of General Motors. An example of this in the beer industry is that Plaintiff Miller has received permission to use the trade name Plank Road Brewery. Miller markets several products under this name and does not place Miller on the label.

32. Missouri's beer labeling statute would require companies who contract-brew beer and who use trade names to change their labels. These companies would have to place the name of the owner of the facility where the beer is brewed on their label. For example, in the case of contract-brewing, Pete's Wicked Ale which is made by Pete's, but is brewed at a facility owned by Stroh's would have to place Stroh's name on its label. In the case of trade names, Miller would have to place the name Miller on each of its Plank Road products.

33. Plaintiffs presented extensive evidence to the Court to prove that the quality and taste of beer was not effected by where the beer was brewed or by who owned the facility. The variable of who owns the brewery does not affect the taste, the ingredients, the time of brewing, or any other discernable quality of the beer. What does appear to be clear, however, is that the beer industry expects that the public will consider a beer mainstream if a mainstream brewery name appears on the label.[2] This is a result the Plaintiffs fear and A–B hopes to achieve.

34. Defendants argue that it is misleading to allow companies like Pete's to fail to state on its labels that Stroh's owns the brewery where its beer is brewed. Defendants, however, fail to fully explain how this is misleading. The Court concludes that a company can rent space from a mainstream brewery and still make a craft or specialty beer.

35. The State and A–B, through amicus briefing, have argued that Plaintiffs are deceiving the public and that this statute provides Missouri citizens with truthful information. The Court concludes, however, that these claims are a dubious cover for the fact that A–B hopes to gain market share from the passage of this law.

36. There are many facts which companies do not place on their beer labels including: calories[3], brewing time, or the size of brewing vats used.

---

**2.** The Court is unable to conclude that the public will automatically consider a beer mainstream simply because it is brewed at a mainstream brewery. The experts who testified on the effects of advertising and label design admitted that it is impossible to exactly determine how each consumer reaches a buying decision. The beer companies, however, seem to all agree that consumers do make certain assumptions based upon the names they see on a label.

**3.** Some light beers do place the number of calories they have on their labels, but the Court is

■ 37. The simple failure to disclose a fact about a product on its label is not automatically deceptive to the public.

38. The failure to disclose the owner of the brewery where the beer was brewed is not deceptive.

39. At its heart, this case is a battle over increasing market share. This statute does not impose a regulatory scheme to control or limit the overall sale of malt liquor in Missouri. Rather this case centers on major beer companies struggling for control of the malt liquor market in Missouri. The Court does not believe that the Legislature considered the interests of the Missouri citizens when they passed this statute. In fact, the record is absolutely void of any evidence that the Legislature had received complaints or testimony from the public on this issue. Rather the competing parties in this case advocate a decision which they believe will help them sell more beer. The Court concludes that without the encouragement of A–B the Missouri legislature would not have passed this statute.[4]

## II. CONCLUSIONS OF LAW

Plaintiffs seek an Order from the Court declaring: (1) that § 311.360.2 violates the Commerce Clause of the Constitution, U.S. Const. art. 1, § 8, cl. 3; (2) that § 311.360.2 violates their right to freedom of speech as guaranteed by the First Amendment to the United States Constitution; (3) that § 311.360.2 and 11 CSR § 7–2.060 violate their procedural due process rights, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, § 10 of the Missouri Constitution; (4) that the MDLC Supervisor has violated their civil rights, in violation of 42 U.S.C. § 1983, by attempting to enforce an unconstitutional statute; (5) Plaintiffs Miller, Coors, and Genesee seek a declaration that their trade names comply with § 311.360.2 and that the labels for those trade names should be approved by Defendants; and (6)

Plaintiffs Pete's and Boston seek a declaration that when they brew beer under an "alternating premises" arrangement, that they are the "owners" of the brewery and that their labels should be approved by Defendants.

### A. Commerce Clause

■ The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. art I, § 8, cl. 3. It is long established that, while a literal reading evinces a grant of power to Congress, the Commerce Clause also directly limits the power of the States to discriminate against interstate commerce. *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (citations omitted) "This 'negative' aspect of the Commerce Clause prohibits economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (citations omitted). Under this "dormant" or "negative" Commerce Clause jurisprudence, state laws that regulate commerce are subject to a two-step inquiry. *Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1383 (8th Cir.), *cert. denied*, ─ U.S. ─, 118 S.Ct. 629, 139 L.Ed.2d 609, and ─ U.S. ─, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997).

■ First, if a state law discriminates against interstate commerce "in favor of local business or investment," it is "per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392, 114 S.Ct. 1677, 1683, 128 L.Ed.2d 399 (1994). "Discrimination" for purposes of the Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys. Inc. v. Department of Envtl.*

---

unaware of any company which places this information on all of its brands.

4. The Court does not include this fact as an indictment against A–B's legitimate use of the

legislative process. Certainly, corporations may lobby legislatures to pass favorable legislation. This fact, however, does reflect upon the purpose as to why this law was introduced and passed.

*Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994); *see also Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995). A state law may discriminate against interstate commerce on its face, in its purpose, or in its effect. *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267 (1995).

■ Second, if a state law does not overtly discriminate against interstate commerce, it may nonetheless be contrary to the Commerce Clause if it unduly burdens interstate commerce. *Id.* 47 F.3d at 268. A nondiscriminatory state law, however, is subject to a less rigorous balancing test. Such a law "will be upheld unless the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

### 1. Does § 311.360.2 Overtly Discriminate Against Out–of–State Economic Interests

Plaintiffs agree that § 311.360.2 does not facially discriminate against them. The language of the statute does not treat in-state and out-of-state producers or importers of malt liquor differently. Plaintiffs do, however, argue that § 311.360.2 discriminates against out-of-state producers and importers of malt liquor in effect and purpose.

### a. Discriminatory Effect

■ A statute has a discriminatory effect if it raises the cost of doing business for out-of-state producers but does not raise the cost for in-state producers. *Hunt v. Washington Apple Adver. Comm.*, 432 U.S. 333, 352, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). The Supreme Court has held that statutes which "raised the cost of doing business for out-of-state dealers, and, in various other ways, favor[ ] the in-state dealer in the local market" have a discriminatory effect. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978). Therefore, the Court must consider whether § 311.360.2 burdens out-of-state companies while providing in state companies with some advantage. The record supports

the conclusion that § 311.360.2 has a discriminatory effect.

### 1. Who is affected by § 311.360.2

■ The parties have not presented the Court with any evidence to suggest that a single Missouri brewer will have to change its labels. Conversely, it is clear that the three biggest brewers [5] in Missouri, which account for 99.8% of the Missouri-brewed beer sold in the state, will not have to change their labels. Furthermore, both a-B and Boulevard, who brew 99.7% of the Missouri-brewed beer consumed in state, own or lease their breweries and are not affected by § 311.360.2. If the costs of § 311.360.2 are not borne entirely by out-of-state producers and importers, they certainly approach the 100% level the Supreme Court found unacceptable in *Hunt* and surpass the 90–95% level that the Eighth Circuit found unacceptable in SDDS. Consequently, while the language of Missouri's labeling statute may be neutral it is clear that the effects of this statute will be borne by out of state companies.

Defendants argue that § 311.360.2 does not affect all out-of-state brewers or importers and that, therefore, it is not discriminatory. They point to nineteen out-of-state breweries which comply with § 311.360.2, including three breweries which contract-brew their beer and still print labels which comply with § 311.360.2, This argument is unpersuasive. Again, the Court looks to *Hunt.* The Supreme Court noted that thirteen states imported apples into North Carolina. Only seven of those states even had grading systems. While it is unclear whether each of those seven states displayed its grading system on the side of its apple boxes, as Washington did, it is clear that apple producers from at least six states were unaffected by North Carolina's statute. Although not all out-of-state apple producers were affected by North Carolina's law, the Supreme Court found that the law had a discriminatory effect and was unconstitutional. Clearly, there

---

**5.** Anheuser–Busch, Boulevard Brewing Co., and St. Louis Brewery, respectively, sold (72,031,-545), (411,112), and (79,142) gallons of beer in

Missouri in fiscal year 1997. All other Missouri brewers sold a combined total of 136,025 gallons of beer in Missouri in fiscal year 1997.

is no requirement that all out-of-state producers be affected for this Court to find that § 311.360.2 is unconstitutional.

## 2. Are Out–of–State producers and importers of malt-liquor burdened by § 311.360.2?

Next, the Court must consider whether Missouri's labeling statute burdens out-of-state producers and importers of malt liquor. The Court believes that § 311.360.2 has a similar discriminatory effect, and places similar burdens on out-of-state producers, as the statutes which were struck down in *Hunt* and *SDDS*. In *Hunt*, North Carolina banned the placement of any grading (other than USDA grading) on closed shipping containers of apples. This measure affected only out-of-state apple producers. Although the statute was facially neutral, the North Carolina apple producers already complied with the new requirements of the statute and, therefore, it did not cost them anything to comply with the statute. This parallels Missouri's statute in that Missouri beer producers already comply with § 311.360.2.

Missouri's beer labeling statute has an almost identical effect on producers of beer as North Carolina's law had on apple growers. In *Hunt* the apple producers were being forced to change the outside label on boxes of apples sent to North Carolina. The apple producers were left with three choices: they could black out or "obliterate" writing on their old labels and then send the apples into North Carolina, they could have developed North Carolina only labels, or they could have changed all of their labels to accommodate North Carolina's law. Beer producers and importers are faced with almost identical considerations and burdens in this case. Producers could develop Missouri only labels, which would result in a higher cost of business. Alternatively, they could change all of their labels, which may lead to market confusion and competitive disadvantages in other states. Finally, they could stop selling their products in Missouri.

In *Hunt* The Supreme Court concluded that the effect of the North Carolina statute was discriminatory because it raised the cost of doing business in the state for Washington apple growers while leaving their North Car-

olina counterparts unaffected. *Hunt*, 432 U.S. at 351, 97 S.Ct. at 2445. The Court also concluded that the North Carolina law had "a leveling effect which insidiously operates to the advantage of local apple producers." *Id.*

Missouri's beer labeling statute places identical burdens on out of state producers. The law will raise the cost of doing business in Missouri for many out-of-state brewers while their Missouri counterparts will receive an economic advantage because their labels are unaffected. Like the apple producers in *Hunt*, producers of beer would have to suffer the expense of designing new labels, and the expenses associated with getting these labels approved, to continue doing business in Missouri. Some brewers may chose to use Missouri only labels and they would have to bare the increased production costs associated with keeping their "Missouri product" separate from the rest of their inventory.

In addition to increasing their labeling costs, Missouri's labeling statute also deprives out-of-state producers and importers of certain marketing advantages they currently enjoy. The challenged statute in *Hunt* was unconstitutional in part because it stripped the Washington apple growers of the economic advantages they had established through their own grading system *Hunt*, 432 U.S. at 351–52, 97 S.Ct. at 2445–46. Missouri's beer labeling statute strips Plaintiffs of the brand equity they have built up through their use of advertising and trade names. The public may associate a brewery owner's name with completely different product qualities of brand identity than the brewer. This compromises the effectiveness of competitive strategies which the Plaintiffs feel best meet their business needs. These competitive strategies include the use of trade names to create distinctive brands and broaden the product's appeal, and the use of other companies' factories to avoid the expense of buying or building a brewery. Though legal in every state, Missouri brewers do not employ these competitive strategies and they would benefit if other out-of-state brewers were prevented from being able to use them.

"Niche advertising" builds brand loyalty by giving the consumer a distinct product

under a distinct trade name. This is no more or less deceptive than any other form of advertising, which always rests on the selective presentation of favorable facts and images.[6] The use of trade names in this context to create new images for new products has been a successful, legitimate[7] business strategy for many companies in many fields.[8] For some Plaintiffs, the beer labeling statute is particularly harsh because it actively undermines their fairly developed brand equity by forcing them to carry on their labels the brand names of competitors who produce very different beverages and have different brand equities.

The Court concludes that § 311.360.2 places economic burdens on out-of-state producers and importers of malt-liquor. As in *Hunt* because they already comply with the statute, no in-state producer of malt-liquor will have to bare any of these burdens. These are the same type of economic and market burdens which the Supreme Court found unconstitutional in *Hunt*.

### 3. Are In–State producers of malt-liquor advantaged by § 311.360.2?

Defendant's argue that in-state producers of malt-liquor derive no proven competitive advantage from Missouri's labeling statute. For the reasons noted above, the Court rejects this argument. In an open market, companies certainly receive a competitive advantage if they can lower their production costs. Consequently, they also receive a competitive advantage if their competition's production costs are increased. As the Supreme Court noted in Hunt when a statute raises the cost of doing business for out-of-state producers without raising the cost for in-state producers, it gives the in-state producers an economic advantage. This is exactly what Missouri's labeling statute does.

Missouri's labeling statute also advantages in-state producers, A–B and Boulevard, by weakening the brand identity of many of their competitors. By forcing Plaintiffs to place other companies names on their labels, Missouri's labeling statute may create market confusion. Plaintiffs have invested millions of dollars in creating brand images. This statute strips away the competitive advantages of contract-brewing and trade names. Because Missouri brewers have not employed these marketing tools, they are advantaged by a law which prevents their competitors from using them.

A–B's aggressive support of this legislation certainly belies any claim that it would not benefit from the passage of this statute. A–B has also supported similar litigation in other states and nationally. Even more compelling, though, is the fact that A–B has suggested to its wholesalers that they use § 311.360.2 as a means of acquiring increased shelf space in Missouri store.[9] It

---

6. The automobile industry provides a prime example of how manufacturers use trade names to promote niche advertising. While Cadillac, Buick, Pontiac, and Saturn are all made by General Motors these trade names produce different images in customers' minds.

7. In its brief A–B cites to the cases of *Friedman v, Rogers* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), and *Maceluch v. Wysong*, 680 F.2d 1062 (5th Cir.1982), to support its argument that trade names can be deceptive. The Court simply notes that neither of these cases concluded that trade names are inherently deceptive and they are factually distinguishable. Both *Friedman* and *Maceluch* deal with statutes that prevent individuals in medical fields from using trade names. The evidence in these cases was far more compelling than the evidence in this case. The Court concludes, that the Defendants have failed to offer any evidence that trade names have been used in a deceptive manner in the beer industry. Moreover, there is no evidence before this Court indicating that the Missouri Legislature believed that

trade names were deceptive or that they passed Missouri's labeling statute based upon that belief

8. Some companies also organize their corporate structures to provide a separate name for separate products. For instance, Phillip Morris owns Miller Brewing Company. If one were to accept Defendants' argument, than it would be "deceptive," although legal under § 311.360.2, for Phillip Morris to fail to place its name on all Miller products.

9. On November 17, 1997, A–B sent a letter to all Missouri wholesalers. The letter highlighted the fact that the Missouri Supreme Court had just upheld § 311.360.2 and went on to state:

    In other words, retailers will also be in violation of this law if they sell any non-complying products. There is a possibility that this will create a shelf-space opportunity for us as some of these products are eliminated from the Missouri package mix. In particular, you should target the following brands if their labels are

certainly appears that A–B believed it would benefit from the passage of Missouri's labeling statute, and to the extent that this belief is true, the Court agrees with it.

Furthermore, the level of benefit which instate producers receive from Missouri's labeling statute is irrelevant. In *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the liquor products that benefitted from a state law regulating interstate commerce constituted less than 1% of the total liquor sales in the state and did not pose a competitive threat to the liquor products burdened by the law. *Id.* 468 U.S. at 268–69, 104 S.Ct. at 3054. The Supreme Court struck the law down noting that these facts only determined the extent of the discrimination. *Id.* 468 U.S. at 269, 104 S.Ct. at 3054 ("It is well settled that '[we] need not know how unequal the [law] is before concluding that it unconstitutionally discriminates.'") (quoting *Maryland v. Louisiana,* 451 U.S. 725, 760, 101 S.Ct. 2114, 2136, 68 L.Ed.2d 576 (1981)).

Finally, The Defendants and A–B cite to the Supreme Court case of *Exxon v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91(1978), to support their argument that Missouri's labeling statute is constitutional. In *Exxon,* even though 100% of the regulatory burden fell on out-of-state companies, the law was upheld as constitutional because it did not benefit any in-state companies and did not burden interstate commerce overall. The Court noted, "[T]he [Commerce] Clause protects the interstate market, not particular interstate firs, from prohibitive or burdensome regulations" *Id.* 437 U.S. at 127, 98 S.Ct. at 2215. Defendants argue that since no Missouri companies clearly benefit from § 311.360.2 and since some out-of-state producers are unaffected by the statute, the statute is not discriminatory.

Defendants err in relying on Exxon, for several reasons. First, the statute in *Exxon,* stated that a producer or refiner of petroleum products could not operate any retail service station within the state of Maryland. Md. Ann.Code, Art. 56, § 157E (Supp.1977). The Supreme Court observed "Since Maryland's entire gasoline supply flows in interstate commerce and since there are **no local producers or refiner,** such claims of disparate treatment between interstate and local commerce would be meritless." *Id.* 437 U.S. at 125, 98 S.Ct. at 2213 (emphasis added). This fact alone destroys any analogy between *Exxon* and the case at bar. Missouri's entire malt-liquor supply does not flow from interstate commerce. Unlike Exxon there are local producers in this case and the impact of this statute is different on them than it is on their out-of-state competition. *Exxon,* therefore, is not a controlling case.

Second, even if the Court considers *Exxon* on its merits, it would not change the result in this case. The Supreme Court in *Exxon* distinguished the Maryland statute from the North Carolina statute in *Hunt.* The Supreme Court held that the Maryland statute did not place added costs on doing business in Maryland, but observed that "the Court in *Hunt* noted that the challenged state statute raised the cost of doing business for out-of-state dealers. and, in various other ways, favored the in-state dealer in the local market." *Id.* 437 U.S. at 126, 98 S.Ct. at 2214 (citation omitted). Supreme Court held that since Maryland dealers would have no competitive advantage over out-of-state dealers the statute was not discriminatory. *Id.* In this case, however, for the reasons stated above, Missouri producers have the same competitive advantage over some of their out-of-state competitors that were present in *Hunt.* Accordingly, *Hunt* is a more analogous case than *Exxon. Exxon* has not overruled any part of Hunt and when a statute gives in-state companies an advantage over out-of-state companies, it has a discriminatory effect.

The Court concludes that out-of-state producers and importers of malt-liquor bear almost 100% of the effect of Missouri's labeling statute. This statute imposes economic and

---

not changed: Samuel Adams, Pete's Wicked Ale, Red Dog, Icehouse, Blue Moon.
Please cover this topic with your sales force during upcoming sales meetings and take ad-

vantage of any opportunities as a result of competitive brand fallout in the market place. (Ex. 315).

marketing burdens upon these out-of-state producers and importers and consequently works to advantage in-state producers who are not affected by the statute. Consequently, the Court concludes that § 311.360.2 has a discriminatory effect on interstate commerce.

### b. Discriminatory Purpose

■ Additionally, the Court believes that the purpose of § 311.360.2 was to discriminate against the out-of-state competitors of A–B and Boulevard. In the absence of clear legislative history it is often difficult to determine a legislature's purpose in passing a statute. In this case, the record is void of any legislative history on § 311.360.2. The Court, therefore, considers other direct and indirect evidence concerning the purpose of § 311.360.2. *SDDS*, 47 F.3d at 268.

The facts surrounding the passage of § 311.360.2 call into question whether there was any legitimate purpose for this statute. The person in charge of enforcing Missouri's labeling laws before the passage of § 311.360.2, Mike Schler, testified that he had no reason to believe any of the Plaintiffs' earlier labels were deceptive or misleading. In fact, the MDLC played no role in getting § 311.360.2 passed. The statute was added to another liquor bill late in the legislative process and the MDLC, which was tracking the other liquor bill, was not even aware of the labeling law until after it was passed. Schler recalls that a lobbyist for A–B told him that A–B had proposed the statute. *See Hunt*, 432 U.S. at 352, 97 S.Ct. at 2446 (noting that Purpose ofstatute was suspect because local apple producers were largely responsible for passing legislation). The MDLC had not received any complaints from the public regarding the deceptive nature of any of the Plaintiffs' labels.[10] *See Security Bank of Minnesota v. C.I.R.*, 994 F.2d 432, 436 (8th Cir.1993) (holding that the circumstance of particular legislation is relevant to ascertaining legislative intent and purpose). This evidence raises doubts as to whether the State had a legitimate interest in advancing § 311.360.2.

Meanwhile, the Defendants offered limited and contradicting evidence on the intended purpose of Missouri's labeling statute. In the labeling statute's implementation regulation, 11 CSR 70–2.060, the State indicated that "Consumers of malt liquor in the State of Missouri are entitled to know the identity of the brewer of manufacturer of an alcoholic beverage sold in Missouri." *Id.* Noticeably absent from this regulation is any mention of Missouri consumers being entitle to know who owns the building where their beer is brewed. Consumers in Missouri are, in fact, able to determine who the brewer or manufacturer of their beer is by reading any of plaintiffs current labels. Therefore, if this truly is the purpose of § 311.360.2, the scope of Missouri's statute is overly broad because it requires brewers, at least those who do not own their own breweries, to disclose the name of the person or company who owns the brewery. The Court concludes that this is an indication that neither the MDLC nor the Missouri Legislature were aware of § 311.360.2's intended purpose.[11]

Now, in a belated attempt to justify Missouri's labeling statute, Defendants contend that this statute protects consumers from unfair and misleading market practices. The Court does not disagree that Missouri's labeling statute requires beer producers to state who owns the brewery where their product is brewed-this is what the statutes does. Under the Commerce Clause, however, the crucial question is what purpose does this information and this statute serve-why does the statute do this? Defendants have responded by arguing that Plaintiffs are unfairly taking advantage of the growth in the craft beer market by not disclosing to the public who owns the brewery where the beer is brewed.

---

10. Although Missouri has a truth in advertising law, there have not been any complaints filed against any of the Plaintiffs for having misleading beer labels.

11. Missouri State Senator Flotron, to whose bill the label statute was added, noted that he would not have supported the new law had he known its effect, and that the bill "was the only liquor bill moving that session and it got piled up with all kinds of stuff that, frankly, I was not familiar with." Columbia Daily Tribune, November 20, 1997.

First, the Court notes that it has been presented with no evidence that this was what actually motivated Missouri's Legislature to pass this statute. Second, even if this was the purpose of the Missouri Legislature, the statute does conspicuously little to advance this interest. All that Missouri's labeling statute actually accomplishes is that companies must place the name of the brewery owner on their beer labels if they do not own the brewery. The evidence in this case indicates that there is no relationship between who owns the brewery where a beer is produced and whether that beer is a craft brewed beer.[12] The ingredients used to brew beer, the brewing process used, the age of the brewing formulas, the care or the number of brewmasters used, the volume of the batches used, and the size of the brewery: these facts may affect the quality and taste of a beer and they may affect the determination of whether a beer is craft, speciality, or micro brewed. But none of these beer qualities are affected by who owns the brewery, and Missouri's labeling statute does not require that any of these facts be disclosed to the public.

In *Hunt* the Supreme Court found it somewhat suspect that the means used to achieve the state's "ostensible purpose" were relatively ineffective. *Hunt*, 432 U.S. at 352, 97 S.Ct. at 2446. Likewise, in determining that South Dakota's statute had a discriminatory purpose, the Eighth Circuit noted that the state "employed a highly ineffective means to pursue its ostensible purpose of environmental protection" *SDDS*. 47 F.3d at 269. The Court concludes that to the extent that Missouri has asserted an ostensible interest in protecting its consumers from unfair marketing, that it has failed to demonstrate how § 311.360.2 furthers that interest. This evidence strengthens the Court's conclusion that Missouri's labeling statute has a discriminatory purpose and was passed to benefit in-state companies.

### c. Does § 311.369.2 Survive Rigorous Scrutiny

The Court has concluded that Missouri's labeling statute has a discriminatory effect and was passed for a discriminatory purpose. A court must apply a strict scrutiny standard of review to a statute which has a discriminatory effect or purpose. *Hunt* 432 U.S. at 352–53, 97 S.Ct. at 2446–47; *SDDS*, 47 F.3d at 271. Such discrimination invokes a "virtually *per se* rule of invalidity." *Id.* If the Act discriminates, the burden falls on the State " 'to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake.' " *Wyoming v. Oklahoma*, 502 U.S. at 454, 112 S.Ct. at 800 (citations omitted). "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979).

To survive strict scrutiny under the Commerce Clause, Missouri must demonstrate that § 311.360.2 provided some local benefits. The Defendants identify "truth-in-labeling" as the sought-after benefit. The Court begins by noting that the statute does remarkably little to promote "truth-in-labeling." First, the Defendants have failed to produce any evidence that there currently is any dishonesty in labeling or that this statute remedies the dishonesty. The absence of any public or legislative concern about this issue points to the minimal nature of the state's interest. Second, the interest of "truth -in-labeling" is already extensively protected by statute and regulation at the federal and state level prohibiting dishonest labels. Third, the statute only regulates a very limited portion of the liquor industry in Missouri. The statute does nothing to address "truth-in-labeling" in a general sense in Missouri. It focuses only on the liquor industry, and within that industry it focuses only on malt-liquor. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 715–16, 104 S.Ct. 2694, 2709, 81 L.Ed.2d 580 (1984).

---

12. The Court has taken judicial notice of the fact that A–B's recent advertising campaign, in which company President August Busch III speaks of the importance of brewmasters, supports this point.

Finally, there is no evidence that Missouri's "truth-in-labeling" statute actually provides any local benefits. The Defendants have completely failed to explain why the fact of who owns the brewery where a beer is brewed benefits the public. The only "truth" this statute seeks is the "truth" of who owns the brewery where the beer is brewed. The statute does not allow the consumer to determine whether a beer is "craft" brewed; it does not tell the consumer who brewed the beer or how they brewed it, and it does not provide the consumer with any useful information regarding the taste or quality of the product. Missouri's labeling statute only tells the consumer which brewers are big enough to own or lease the brewery where their beer is brewed. The Court concludes that to the extent that § 311.360.2 promotes any local interest, the limited nature of the statute allows for nothing more than the most minimal of interests to be promoted.

Finally, the burden also falls on the state to demonstrate the unavailability of nondiscriminatory alternatives. *SDDS*, 47 F.3d at 271 The Court finds that there are currently nondiscriminatory alternatives available to the Defendants to ensure that Plaintiffs or other beer producers do not engage in unfair or misleading market practices. The State can turn to Missouri revised Statute § 407.020 to pursue this goals in a nondiscriminatory manner.

Consequently, because the Court finds that Missouri Revised Statute § 311.360.2 provides only the most minimal of local benefits, and that a nondiscriminatory alternative was available, the statute fails the required strict scrutiny. The Court therefore concludes that § 311.360.2 violates the dormant aspects of the Commerce Clause of the United States Constitution.

### 2. Does § 311.360.2 Unduly Burden Interstate Commerce

■ Alternatively, the Court finds that § 311.360.2 fails the more flexible balancing test set forth in *Pike* 397 U.S. at 142, 90 S.Ct. at 847, which was followed by the Eighth Circuit in *Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280, 284 (8th Cir. 1993). As the Court has previously note, the benefits to the State of Missouri are minimal, yet the burden placed on interstate commerce is significant both in dollars and injury to the business of Plaintiffs. In *Pioneer Military*, a one time cost of $80,000 and $123,000 annual costs were a sufficient burden on interstate commerce to invalidate the State's regulations, given the minimal state interest involved. The Court believes that Plaintiffs in this case will sustain increased costs in excess of those which unduly burdened interstate commerce in *Pioneer Military*. Moreover, the Court finds that the State interest is even more *minimal* than the "relatively slight local interest" which existed in *Pioneer Military*.[13] Accordingly, the Court concludes that even if § 311.360 does not overtly discriminate against out-of-state commerce, it unduly burdens interstate commerce and is unconstitutional.

### B. The Twenty-first Amendment and the Commerce Clause

Defendants argue that even if § 311.360.2 and 11 CSR 70–2.060 violate ordinary Commerce Clause principles, they are saved by § 2 of the Twenty-first Amendment.[14] The Supreme Court has recognized that the Twenty-first Amendment provides an exception to the limitations of the dormant Commerce Clause in certain situations. *44 Liquormart, Inc. v. Rhode Island* 517 U.S. 484, 516, 116 S.Ct. 1495, 1514–15, 134 L.Ed.2d 711 (1996). Defendants, therefore, argue that because of the Twenty-first Amendment

---

13. Defendants argue that it is improper to consider the effect that the statute has on certain business, that the Court must consider the effect that the statute has on interstate commerce as a whole. *Exxon*, 437 U.S. at 127–28, 98 S.Ct. at 2215. The Eighth Circuit, however, has specifically held that "The burden a state regulation places on a single firm's interstate activities can be excessive under the Commerce Clause." *Pioneer Military*, 2 F.3d at 283.

14. Section 2 states "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const., Amdt. 21, § 2.

§ 311.360.2 and 11 CSR 70–2.060 survive even if they impose burdens on interstate commerce that would not survive Commerce Clause review.

▇▇▇ "It is well settled that the Twenty-first Amendment did not entirely remove state regulation of alcohol from the reach of the Commerce Clause." *Brown–Forman Distillers Corp. v. New York State Liquor Authority* 476 U.S. 573, 584, 106 S.Ct. 2080, 2087, 90 L.Ed.2d 552 (1986) ("To draw a conclusion that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification.") (citations omitted). "Rather, the Twenty-first Amendment and the Commerce Clause 'each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case.'" *Brown–Forman,* 476 U.S. at 584, 106 S.Ct. at 2087 (quoting *Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 332, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350 (1964)).

In an effort to balance the competing interests of the Twenty-first Amendment and the Commerce Clause, the Supreme Court requires a mode of analysis which it describes as a "pragmatic effort to harmonize state and federal powers." *Bacchus,* 468 U.S. at 275, 104 S.Ct. at 3057. The Court must inquire "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express [federal] policies." *Id.* 468 U.S. at 275–76, 104 S.Ct. at 3057 (balancing Twenty-first Amendment and Commerce Clause) (quoting *Capital Cities Cable,* 467 U.S. at 714, 104 S.Ct. at 2708 (balancing Twenty-first Amendment with federal antitrust policy)). Therefore, the Court must inquire whether the principles underlying the Twenty-first Amendment are sufficiently implicated by Missouri's beer labeling requirement to outweigh the Commerce Clause principles that would otherwise be offended.

The Supreme Court stated in *Bacchus,* that the central purpose of the Twenty-first Amendment was "not to empower States to favor local liquor industries by erecting barriers to competition." *Bacchus,* 468 U.S. at 276, 104 S.Ct. at 3058. The Court went on to state:

> It is also beyond doubt that the Commerce Clause itself furthers strong federal interests in preventing economic Balkanization. *South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935). State laws that constitute mere economic protectionism are therefore not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor.

*Id.* In *Bacchus,* the State did not argue that its statute advanced the goals of temperance or any other purpose of the Twenty-first Amendment but admitted that its purpose was to "promote local industry." Accordingly, the Court held that the Twenty-first Amendment did not save the statute from Commerce Clause violations.

### 1. Promotion of Temperance

▇▇▇▇ A state's desire to promote temperance is clearly legitimate pursuant to the Twenty-first Amendment. In this case the Defendants have only made a half-hearted assertion that § 311.360.2 promotes temperance. Defendants argue that temperance while often mistaken for abstinence, is defined as "moderation in or abstinence from the use of intoxicating drinking" *44 Liquormart,* 517 U.S. at 491 n. 4, 116 S.Ct. at 1502 n. 4. Notwithstanding this point, there is absolutely no evidence before the Court regarding how § 311.360.2 promotes moderation, much less abstinence, in alcohol consumption. Not only have Defendants not offered any evidence on the issue of temperance, they have not advanced any legal argument or theory explaining how § 311.360.2 promotes temperance. Quite simply, no one has argued that if companies are forced to change their beer labels people will buy less

beer.[15] The Court concludes, as a matter of fact, that § 311.360.2 does not have a temperance purpose or temperance effect.

Moreover, even if § 311.360.2 did have the purpose or effect of promoting temperance, the modest nature of Missouri's temperance interests as represented by the statute are insufficient to save it from violating the Commerce Clause. *See Capital Cities Cable*, 467 U.S. at 713–15, 104 S.Ct. at 2708–09 (holding that the selective approach the State took toward its ban on liquor advertising suggests State's temperance interest is minimal and insufficient to overcome federal interest); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc.*, 445 U.S. 97, 113–14, 100 S.Ct. 937, 947–48, 63 L.Ed.2d 233 (1980) (holding that State's interest in promoting temperance through statute was not substantial and was therefore clearly outweighed by the important federal objectives of the Sherman Act). In this case, Missouri's regulatory aims are very narrow. The statute only affects the labeling of beer with an alcohol level of higher than 3.2% and lower than 5% of alcohol by weight. 11 CSR 70–2.010(3). The statute does not even affect all kinds of beer or any other kind of liquor. The selective approach Missouri has taken toward liquor and beer labeling suggests limits on the substantiality of the interests it asserts here.

### 2. Core Twenty-first Amendment Regulations Besides Temperance

Next, Defendants argue that nothing in the Twenty-first Amendment requires that state laws regulating liquor be motivated exclusively by a desire to promote temperance. *See Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 47, 86 S.Ct. 1254, 1262, 16 L.Ed.2d 336 (1966). Stated affirmatively, Defendants argue that the regulation of the "sale or use" of liquor and the regulation of "liquor distribution systems" are core Twenty-first Amendment regulations, *see North Dakota v. United States*, 495 U.S. 423, 431,

110 S.Ct. 1986, 1992, 109 L.Ed.2d 420 (1990) (discussing regulation of liquor distribution systems); *Capital Cities Cable*, 467 U.S. at 713, 104 S.Ct. at 2707 (discussing regulations of the sale or use of liquor), and that Missouri has an interest in "ensuring orderly market conditions" for liquor. *North Dakota* 495 U.S. at 432, 110 S.Ct. at 1993.

The Court, however, is not persuaded that § 311.360.2 accomplishes any of these objectives. As noted above, viewed optimistically, § 311.360.2 was passed by the Missouri Legislature to protect Missouri consumers and inform them of who owns the brewery where their "malt liquor" was brewed. Viewed skeptically, § 311.360.2 was passed to benefit in-state Missouri brewers who own their own breweries and believe that they will benefit from implementation of the statute. Viewed skeptically, § 311.360.2 constitutes nothing more than economic protectionism and, in light of the Supreme Court's holding in *Bacchus*. the Twenty-first Amendment does not save it from being struck down by the Commerce Clause.[16]

But even viewed optimistically, the Court does not find that the purpose of § 311.360.2 is to ensure orderly market conditions or regulate the sale of liquor within the meaning of the Twenty-first Amendment. First, the Court examines *North Dakota v. United States*, the case on which Defendants rely to assert that the State has a legitimate interest in ensuring orderly market conditions. Second, the Court considers whether § 311.360.2 really "regulates the sale" of liquor as contemplated by the Twenty-first Amendment.

#### a. Does § 311.360.2 ensure orderly market conditions

In *North Dakota*, the Supreme Court considered the constitutionality of two North Dakota statutes which acted in concert to require an out-of-state supplier which transported liquor into the State to affix a label to each bottle of liquor destined for delivery to

---

**15.** The evidence presented to the Court in this case indicates that consumers do not decide whether they want to purchase beer based upon its label, but rather they may decide which beer to buy based upon its label.

**16.** As noted in § A.1.b of this Order, the Court believes that Missouri's labeling statute has a discriminatory purpose. In this section of its Order, however, the Court notes that even if this holding is rejected or ignored the Twenty-first Amendment still does not save the statute from being struck down by the Commerce Clause.

a federal enclave and that it report the volume of liquor it has transported. The Supreme Court found that "[t]he risk of diversion into the retail market and disruption of the liquor distribution system is thus both substantial and real." *Id.* 495 U.S. at 433, 110 S.Ct. at 1993. In finding that this statute fell within the core of a State's power under the Twenty-first Amendment the Court stated, "In the interest of promoting temperance, ensuring orderly market conditions, and raising revenue, the State has established a comprehensive system for the distribution of liquor within its borders." *Id.* 495 U.S. at 432, 110 S.Ct. at 1993.

The Court finds Defendants reliance on this case inappropriate for several reasons. First, in North Dakota the Court clearly stated that the statutes promoted temperance. Although the Court found that the statutes fell within the "core of the State's power under the Twenty-first Amendment," the Supreme Court did not state that "ensuring orderly market conditions" was a core Twenty-first Amendment regulation. This Court does not believe that a statute which ensures orderly market conditions [17] but fails to promote temperance falls within core Twenty-first Amendment regulations. Second, and more importantly, the statutes in *North Dakota* presented a "comprehensive system" for regulating the importation and distribution of all liquor into North Dakota. *Id.* Section 311.360.2 does not monitor the importation of beer into Missouri, nor does it act to prevent the disruption of Missouri's liquor distribution system. Therefore, *North Dakota* is easily distinguishable from the case at bar and the Court does not find that the same kind of Twenty-first Amendment interests are present in this case.

### b. Does § 311.360.2 regulate the sale of liquor as contemplated by the Twenty-first Amendment

■■■ Second, Defendants argue that § 311.360.2 directly impacts consumers buying decisions and therefore regulates the sale and consumption of alcoholic beverages. De-

fendants' argument continues, that because the regulation of the sale of alcohol is a core Twenty-first Amendment interest, § 311,-360.2 should survive in spite of the Commerce Clause. Such a broad interpretation of the Twenty-first Amendment, however, would lead to the elimination of the Commerce Clause in alcohol related cases. Any statute which implicates the Twenty-first Amendment necessarily regulates the sale of alcohol. The Supreme Court, however, has struck down state statutes which violate the Commerce Clause or other federal policies even though they regulated the sale of alcohol. *See Bacchus,* 468 U.S. at 276, 104 S.Ct. at 3058; *Capital Cities Cable,* 467 U.S. at 713, 104 S.Ct. at 2707. The Court concludes that for a state statute to survive a Commerce Clause violation it must do more than simply regulate the sale of alcohol, it must effect the structure of the state liquor distribution system. *North Dakota,* 495 U.S. at 431, 110 S.Ct. at 1992. Missouri's beer labeling statute does not regulate the distribution of liquor in the State. As such, the statute may have a secondary effect on the sale of some kinds of beer, but it does not implicate the State's core power under the Twenty-first Amendment and it does not outweigh the importance of the Commerce Clause.

Finally, to the extent that § 311.360.2 accomplishes any of these objectives, it does not regulate the "sale," "use," "distribution," or "market condition" of all beer, much less all liquor, in Missouri. Therefore, to the extent that Missouri advances any of the core purposes of the Twenty-first Amendment through § 311.360.2 the advance is so insubstantial that it is clearly outweighed by the important federal objectives of the Commerce Clause. Consequently, the twenty-first Amendment does not save Missouri's labeling statute from being struck down by the Commerce Clause.

### C. Plaintiffs' 42 U.S.C. § 1983 Claim

■■■ Plaintiffs have also brought a claim under 42 U.S.C. § 1983 against Defendant

---

**17.** Neither Defendants nor A–B have presented the Court with any evidence or argument addressing how § 311.360.2 actually ensures an orderly market for beer. Plaintiffs argue that § 311.360.2 will actually create confusion in the

marketplace. As compared to the statutes in *North Dakota,* which actually prevented untaxed liquor from entering the retail market § 311.360.2 does nothing to ensure order in the liquor or beer market in Missouri.

Hope E. Whitehead in her official capacity. Plaintiffs request a permanent injunction against Whitehead and request monetary damages and their reasonable attorneys' fees and costs. The Supreme Court in *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), and the Eighth Circuit in *Waste Systems Corp. v. County of Martin,* 985 F.2d 1381 (8th Cir.1993), have held that Commerce Clause violations are cognizable under 42 U.S.C. § 1983. Litigants who successfully bring suit under the Commerce Clause may recover damages under § 1983 and attorney's fees under § 1988.

To the extent that Plaintiffs seek a permanent injunction against Whitehead under § 1983, such a request has been granted by the Court's declaratory judgment that § 311.360.2 violates the Commerce Clause and shall be permanently enjoined. To the extent that Plaintiffs seek any damages under § 1983, Plaintiffs failed to produce any evidence at trial that they have suffered any monetary damages, apart from attorneys' fees and costs, because of § 311.360.2's enactment. In fact, the record clearly shows that § 311.360.2 was never enforced against the Plaintiffs and that they did not suffer any economic harm in the market as a result of this statute.

Next, the Court turns its attention to Plaintiffs' request for attorneys' fees under 42 U.S.C. § 1983. The Eighth Circuit, at least in a footnote, has expressed reservation whether attorneys' fees should be recoverable in dormant Commerce Clause cases. *See Pioneer Military,* 2 F.3d at 285 n. 4 (quoting *Dennis,* 498 U.S. at 462–65, 111 S.Ct. at 879–80 (Kennedy, J. dissenting and expressing concern that dormant Commerce Clause plaintiffs typically have sufficient resources to litigate without fee shifting statute)). Generally, the prevailing plaintiff should recover attorneys' fees unless special circumstances would render such an award unjust. *Johnson v. Mississippi,* 606 F.2d 635, 636–37 (5th Cir.1979) (citations omitted). Another district court in the Eighth Circuit recently awarded plaintiffs attorneys fees under similar circumstances as this case. *Poor Richard's Inc. v. Ramsey County, Minnesota,* 927 F.Supp. 1206, 1207 (D.Minn.1996). The Court notes that this is an emerging and changing area of the law and that it has not received any briefing on the issue of awarding attorneys' fees in this action. Accordingly, the Court requests that the parties submit further briefing on this limited issue.

### D. Plaintiffs' Other Claims

Because the Court has concluded that § 311.360.2 violates the Commerce Clause of the United States Constitution, the Court does not reach the merits of Plaintiffs' First Amendment, due process, "trade name," or "alternating premises" claims.

### III. CONCLUSION

Accordingly, for the reasons stated above, it is hereby ORDERED that Plaintiffs' motion for a permanent injunction of § 311.360.2 is GRANTED. It is further

ORDERED that Defendants are permanently enjoined from enforcing Missouri Revised Statute § 311.360.2. It is further

ORDERED that within thirty (30) days from the date of this Order both parties shall submit briefs addressing the limited issue of whether Plaintiffs' attorneys' fees should be shifted pursuant to 42 U.S.C. §§ 1983, 1988. Plaintiffs are also directed to submit all necessary affidavits, including contemporaneous time records, and argument which may be required by the Court to determine what a reasonable award of fees would be in this case. Briefs shall be limited to twelve (12) pages exclusive of Plaintiffs' supporting affidavits. Each party may submit a ten (10) page reply brief to the other parties brief with in forty-five (45) days from the date of this order. The Court considers the judgment on the merits of this case to be final.

IT IS SO ORDERED.